# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 21-1413V
UNPUBLISHED

| | |
|---|---|
| EDUARDO ATJIAN, II, | Chief Special Master Corcoran |
| Petitioner, | Filed: October 18, 2022 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Pre-Assignment Review (PAR); Attorney's Fees and Costs; Reasonable Basis; Good Faith; Human Papillomavirus (HPV) Vaccine; Various Injuries |
| Respondent. | |

*Andrew Donald Downing, Downing, Allison & Jorgenson, Phoenix, AZ, for Petitioner.*

*Heather Lynn Pearlman, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION ON ATTORNEY'S FEES AND COSTS[1]

On June 1, 2021, Eduardo Atjian, II, filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered food allergies, a neurological and movement disorder, chronic pain, chronic fatigue, and autonomic dysfunction which was caused-in-fact by human papillomavirus ("HPV") vaccines he received on July 3, 2019, and September 16, 2019. ECF No. 1 ¶ 18. Petitioner withdrew the case on February 14, 2022, and now seeks an award of attorney's fees and costs.

For the reasons discussed below, I find there was sufficient reasonable basis and good faith for Petitioner's claim, and that he is otherwise entitled to a fees award, despite the circumstances of dismissal. However, I have reviewed the submitted billing records

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "Section" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

and find a reduction in the amount of fees awarded to be appropriate, for the reasons detailed below.

## I.     Brief Procedural History

After the claim's initiation, it was assigned to the Office of Special Masters' ("OSM") Pre-Assignment Review ("PAR") process, which is intended to conduct a preliminary review to determine if records consistent with Section 11(c)(1) of the Act have been filed in the case. PAR occurs before a claim is assigned to a specific special master, or the "special processing unit" section responsible for claims thought likely to settle or easy to resolve.

Within six months of filing, Petitioner had filed 15 exhibits totaling 466 pages of medical records, offering his Statement of Completion on January 11, 2022, certifying that all the relevant medical records have been filed in this case. ECF No. 18. On January 27, 2022, I issued a standard "240-day notice," as required by Section 12(d)(3)(A)(ii), informing petitioner that he now could, if he chose, withdraw his petition under Section 21(b) or choose to have his petition remain in the Vaccine Program. ECF No. 19. On February 7, 2022, Petitioner timely filed a Notice of Intent to Withdraw from the Vaccine Program. ECF No. 20. Subsequently, I issued an Order Concluding Proceedings Pursuant to Vaccine Rule 10(d) on February 14, 2022. ECF No. 21.

On March 11, 2022, Petitioner filed a motion for attorney's fees and costs seeking $12,599.24. Motion for Final Attorney's fees and Costs ("Mot."), ECF No. 23. On March 23, 2022, Respondent filed an opposition ("Opp."), arguing that Petitioner had failed to establish a reasonable basis and good faith for his claim. ECF No. 25. On March 31, 2022, Petitioner replied to Respondent's arguments ("Reply"). ECF No. 26. Finally, on April 1, 2022, Petitioner filed a Supplemental Motion for Attorney Fees and Costs ("Supp. Mot.") for additional expenses incurred preparing the reply to Respondent's opposition. ECF No. 27. In total, Petitioner is seeking $15,114.24 in attorney's fees and costs.

## II.    Litigation Against the Vaccine Manufacturer as Rationale for Dismissal

The context of the dismissal of this claim is relevant to whether fees are appropriate for work performed on this case. This case is not an instance in which a petitioner has made a personal decision to end his claim, or has made evidentiary determinations that the claim cannot go forward. On the contrary – Petitioner *intends* to pursue the claim, but simply outside the forum of the "Vaccine Court" (as the Office of Special Masters at the U.S. Court of Federal Claims is sometimes colloquially termed). This case thus "ended before it started," and never even completed the initial PAR process.

Petitioner's counsel, Mr. Andrew Downing, has been honest about his intentions in this case and many others like it. In the summer of 2020, he informed OSM staff that individuals who had received the HPV vaccine formulation manufactured by Merck (known by the trade name "Gardasil") might properly be joined into a large-scale case in California state court alleging that Merck had negligently manufactured and promoted the vaccine, resulting in injuries that would otherwise be the basis for Program claims.[3] He thus anticipated that he would be filing a large number of cases in the Vaccine Program that he did not intend to fully litigate there. But because the Vaccine Act shields manufacturers from liability (except as specifically provided),[4] Mr. Downing was obligated to initiate his claims in the Program, "passing through" it until he reached the specific circumstances the Act permits for a claim to exit the Program.

In hopes of expediting these HPV cases to their ultimate intended forum, Mr. Downing proposed a process for their efficient movement through the Program.[5] In response, I noted at the time that the Act did not *per se* prohibit claimants from availing themselves of the specified means of ending a case, regardless of their purpose in so doing. However, I also noted that the rules and procedures provided by the Vaccine Act for filing claims must be followed, even if it was expected that an initiated claim would not be litigated to its completion. As such, claims involving the HPV vaccine had to be litigated like any other and meet the requirements that all cases must meet in the Program – at all relevant stages.

At present, there are currently almost 70 cases filed by Mr. Downing pending in the Vaccine Program which have followed this exact pattern – dismissal within a year or less of filing – and are now awaiting fee decisions, with a range of sums sought in each.[6] In order to provide guidance that can be applied in all these cases, I am addressing the issues raised herein at considerable length, with the intention of referencing this fees determination in the future.

---

[3] Rather than state court, Petitioner eventually filed suit in the Central District of California (No. 2:22−01739), and his case has been consolidated with other federal cases in multidistrict litigation. ECF No. 29 (Order from U.S. Judicial Panel on Multidistrict Litigation).

[4] *See* Sections 11(a)(2)(A)(ii) and 22-23.

[5] As Mr. Downing indicated in his Reply, Respondent also rejected the proposed streamlined process for these types of cases. Reply at 7.

[6] While procedurally these cases are almost identical, the amount of attorney's fees and costs requested ranges from approximately $6,000 to $21,000.

### III.    Entitlement to an Award of Attorney's Fees and Costs

As a general matter, only successful cases are guaranteed some award of attorney's fees and costs. However, the Vaccine Act also permits fees in *some* unsuccessful cases, in keeping with the Program's goal of ensuring that petitioners have adequate assistance from counsel when pursuing their claims. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Sebelius v. Cloer*, 133 S.Ct. 1886, 1895 (2013) (discussing this goal when determining that attorney's fees and costs may be awarded even when the petition was untimely filed). Thus, it is fair to say that the Act "employs a liberal fee-shifting scheme" that is particularly generous to petitioner's counsel under most circumstances. *Davis v. Sec'y of Health & Hum. Servs.*, 105 Fed. Cl. 627, 634 (2012). It may be the only federal fee-shifting statute that permits unsuccessful litigants to recover fees and costs.

Of course, Congress did not intend that every losing petition be automatically entitled to an award of attorney's fees and costs. *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994). There is thus a threshold requirement for fees in an unsuccessful case – petitioners must demonstrate "that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Section 15(e)(1). Even then, establishing reasonable basis does not automatically *require* an award, as special masters are still empowered by the Vaccine Act to deny or limit fees. *James-Cornelius on behalf of E. J. v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021) ("even when these two requirements are satisfied, a special master retains discretion to grant or deny attorney's fees" in an unsuccessful case).

As the Federal Circuit has explained, the attorney's fees and costs analysis involves two distinct inquiries: (1) a subjective one assessing whether the petition was brought in good faith and (2) an objective one ascertaining whether reasonable basis for the petition existed. *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344 (Fed. Cir. 2020) ("Good faith is a subjective test, satisfied through subjective evidence"); *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-0544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) ("[T]he 'good faith' requirement . . . focuses upon whether petitioner honestly believed he had a legitimate claim for compensation."); *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (quoting *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 289 (2014)) (addressing the objective requirements of reasonable basis).

I proceed to analyze good faith and reasonable basis for this claim in turn.

### A. Good Faith

Good faith is a subjective standard. *Simmons*, 875 F.3d at 635. As previous cases have pointed out, the term is not defined in the Vaccine Act, and the legislative history provides no helpful context. *See Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *4 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Thus, the term's plain meaning, as provided by definitions from legal dictionaries or case law, is the basis for understanding "good faith" in the Vaccine Program. *Id.; Crowding v. Sec'y of Health & Hum. Servs.,* No. 16-876V, 2019 WL 1332797, at *9 (Fed. Cl. Spec. Mstr. Feb. 26, 2019).

Good faith in a legal sense has been defined to be a "state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." *Black's Law Dictionary* (11th ed. 2019). The converse, bad faith, involves conduct indicating "dishonesty of belief, purpose, or motive." *Id.* In the Vaccine Program, a petitioner is "entitled to a presumption of good faith as is the government." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). A special master is justified in presuming good faith "in the absence of direct evidence of bad faith." *Id.*

Some special masters have, however, noted that claimants have an affirmative obligation to *establish* good faith, just as they must come forward with objective proof to support their claim in establishing reasonable basis. *See, e.g., Spahn v. Sec'y of Health & Hum. Servs.*, No. 09-386V, 2017 WL 6945560, at *1 (Fed. Cl. Spec. Mstr. Dec. 13, 2017) (stating that in a claim that did not receive compensation, a petitioner must establish that the petition was brought in good faith and there was a reasonable basis for the claim before receiving fees and costs). Simply put, good faith is "whether petitioner honestly believed he had a legitimate claim for compensation." *Turner*, 2007 WL 4410030, at *5. But more kinds of evidence can be used to establish good faith – including attorney conduct (which is not relevant to a claim's reasonable basis). *See, e.g., Simmons*, 875 F.3d at 636 ("an impending statute of limitations deadline may relate to whether 'the petition was brought in good faith' by counsel"), *see also Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018) (deeming "effort that an attorney makes to investigate a claim or to ensure that a claim is asserted before the expiration of the statutory limitations period" relevant to good faith inquiry); *Crowding*, 2019 WL 1332797, at *12.

Cases that have evaluated good faith, but found it lacking, involved demonstrations of the petitioner's knowledge that the alleged vaccine injuries had more likely alternative causes, such as child abuse; their refusal of further vaccines; their communications with counsel and experts; and their conduct in prosecuting claims once they are filed. *Heath*

*v. Sec'y of Health & Hum. Servs.*, No. 08-86V, 2011 WL 4433646 (Fed. Cl. Spec. Mstr. Aug. 25, 2011); *Moran v. Sec'y of Health & Hum. Servs.*, No. 07-363V, 2008 WL 8627380 (Fed. Cl. Spec. Mstr. Dec. 12, 2008); *O'Dell v. Sec'y of Health & Hum. Servs.*, No. 89-42V, 1991 WL 123581 (Fed. Cl. Spec. Mstr. June 19, 1991).

      **a.    Parties' Arguments**

Petitioner defines good faith as an "honest belief that [he] suffered an injury due to the vaccination at issue." Mot. at 2. While Petitioner has withdrawn his claim from the Vaccine Program, he attests that he believes that the HPV vaccine caused his injuries, noting that he will be pursuing a civil action against the vaccine manufacturer based upon that belief even after this case's dismissal. *Id.*; ex. 1 (affidavit).

Respondent argues that for a case to be brought in good faith, it must be brought "with the intent to litigate the merits of the claim" in the Program. Opp. at 12-13. In claiming that Petitioner did not intend to litigate his vaccine claim on the merits, Respondent points to Petitioner's admission that he was merely statutorily compelled to initiate his claim in the Vaccine Program prior to pursuing a cause of action against the vaccine manufacturer directly – his "real" goal. ECF No. 1 (Petition) at 1; ECF No. 20 (Notice of Intent to Withdraw); Mot. at 1. And indeed – Petitioner does not contest that he followed this very course of conduct.

To support this argument, Respondent has cited Congressional intent in establishing the Vaccine Program. Opp. at 12. Referring to Section 11(a)(2), Respondent asserts that because "a person claiming a vaccine injury cannot bring a civil suit for damages for that injury before first filing a petition for compensation in the Vaccine Program … Congress intended that the Vaccine Program would serve as the primary vehicle for resolving vaccine injury claims in this country." *Id.* Additionally, Respondent claims that "one of the primary purposes of the Vaccine Program was to divert litigation over alleged vaccine injuries away from vaccine manufacturers, in order to help ensure a robust supply of vaccines." *Id.* (citing *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 229 (2011) and H.R. Rep. No. 99-908).

In his Reply, Petitioner argues that Respondent is attempting to "re-define 'good faith' with a never before asserted definition that … means an intent to litigate the merits of the claim to completion." Reply at 4. Petitioner cites two recent decisions on similar motions for attorney's fees and costs where Respondent advocated this definition of good faith: *Thomas v. Sec'y of Health & Hum. Servs.*, No. 20-886V, 2021 WL 2389837 (Fed. Cl. Spec. Mstr. May 17, 2021) and *Hoover v. Sec'y of Health & Hum. Servs.*, No. 20-1394V, 2021 WL 5575768 (Fed. Cl. Spec. Mstr. Nov. 1, 2021). *Id.* at 5-6. In both *Thomas*

and *Hoover*, the Special Masters did not find Respondent's interpretation of good faith to be persuasive. *Thomas,* 2021 WL 2389837, at *11; *Hoover,* 2021 WL 5575768, at *7.

### b.   Existence of Good Faith Has Been Established

The case law cited above stands for the general proposition that a subjective belief in the legitimacy of a vaccine claim can supply the required good faith – no matter how factually misplaced that belief may be (even from the start). Here, Petitioner has asserted in all his filings that he believes he was injured by an HPV vaccine. Petitioner has filed 15 exhibits, including 466 pages of medical records, his affidavit, and a signed PAR medical Questionnaire consistent with his view. Respondent does not contest that Petitioner sincerely believes he was injured by an HPV vaccine. Opp. at 16, 17. Under this well-accepted definition, Petitioner has clearly established good faith.

Respondent, however, argues that even if the Petitioner *himself* personally believed in his claim's legitimacy, "the intent to litigate the merits of the claim" also bears on good faith. Opp. at 13. In effect, Respondent reasons that filing a petition with the explicit intent to withdraw from the Vaccine Program "corrupts" whatever good faith existed with respect to the claim's merits. Opp. at 12, 13. This conception of good faith takes the focus off the subjective view of the claim's merits and places it on the claimant's procedural intent. Indeed, Respondent views the determination *ab initio* to pull the claim before it is resolved as impeding the Program, imposing "transaction costs" of handling "cases which petitioner never intended to litigate before the court." Opp. at 19. Since the Program was founded in part to provide "significant tort-liability protections for vaccine manufacturers," Petitioner's acts subvert that goal. Opp. at 12 (citing *Bruesewitz*, 562 U.S. at 229).

Respondent's arguments have some merit. Unquestionably one of the purposes of the Vaccine Program is to divert litigation away from vaccine manufacturers. Allowing claims to make a short pass through the Program, only to rush toward litigation against a manufacturer, flies in the face of one of the Act's foundational goals. However, the Act itself does not categorically eliminate the possibility of all vaccine litigation in other civil courts. The Supreme Court described the Vaccine Act's protections for vaccine manufacturers as "significant," but not absolute. *Bruesewitz*, 562 U.S. at 229. Indeed, the Act *includes* specific guidelines for the nature of such a civil claim, which can only be pursued after a claim has passed through the Program in some form. *See* Sections 22-23.

Thus, it certainly cannot be said that the Act prohibits what Petitioner and his counsel have done in this matter. And in fact – as Respondent acknowledges – *the Vaccine Act provides mechanisms by which petitioners may exit the Program* before a

claim is resolved on the merits. In particular, and as relevant to this case, petitioners may leave the Program 240 days after filing, and then pursue actions in other civil courts. Opp. at 12. Respondent has not attempted to reconcile the withdrawal permitted by Section 21(b) (or Vaccine Rule 21(a) more broadly) with the larger purpose of diverting vaccine litigation.

In relevant part, Section 12(d)(3)(A)(ii) states that "[t]he decision of the special master shall … be issued as expeditiously as practicable but not later than 240 days … after the date the petition was filed." Section 12(g)(1) establishes a procedure that "[i]f a special master fails to make a decision on a petition within the 240 days prescribed by subsection (d)(3)(A)(ii) … the special master or court shall notify the petitioner under such petition that the petitioner may withdraw the petition under section 300aa—21(b) of this title." In this case, I issued a 240-day notice because a decision had not yet been issued, and Petitioner timely filed a notice of his intent to withdraw as allowed under Section 21(b). The statue does not impose any other requirements for a 240-day withdrawal. As such, Petitioner fully complied with the 240-day procedure.

The Vaccine Act encourages special masters to issue decisions as "expeditiously as practicable" within 240 days of filing. Section 12(d)(3)(A)(ii). It was likely envisioned at the Program's start (more than 30 years ago, it should be noted) that claims could be resolved in so short a timeframe. But the Program's large docket (which at present features nearly 4,000 open cases) does not allow for such optimistic timelines to be realized in practice today. Thus (and even if this provision of the Act might reasonably be updated at some point to reflect the realities of processing vaccine injury claims), it remains the case that the Act *envisions and allows* claimants to leave the Program after a defined period of time – for whatever reason.

Petitioner has demonstrated his subjective belief that he was injured by an HPV vaccine such that he should receive compensation from the Vaccine Program for the injury, and he complied with the procedures set forth by the Act to withdraw his case. His expressed intent to pursue the claim in a different forum and different way does not lessen his view that *otherwise* the claim is meritorious, and I find in any event that the desire to proceed elsewhere (even in the hopes that he is *more* likely to succeed outside of the Program) does not lessen his otherwise-demonstrated belief in the claim's underlying merit *had it been litigated herein*.[7] As such, Petitioner has met the good faith requirement for a fees award.

---

[7] I would distinguish this case from one where the petitioner is demonstrated to be aware of his claim's facial inadequacy, but pursues the claim in any event.

### B.  Reasonable Basis

"Reasonable basis … is an objective test, satisfied through objective evidence." *Cottingham,* 971 F.3d at 1344. The reasonable basis requirement is less concerned with the claim's likelihood of success, and more with "the feasibility of the claim." *Turner*, 2007 WL 4410030, at *6 (quoting *Di Roma v. Sec'y of Health & Hum. Servs.,* No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). The Federal Circuit recently explained "that a reasonable basis analysis is limited to objective evidence, and that subjective considerations, such as counsel's subjective views on the adequacy of a complaint, do not factor into a reasonable basis determination." *James-Cornelius on Behalf of E. J. v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021).

As I have noted in prior cases, reasonable basis is an extremely lenient standard, especially in comparison to the preponderant standard governing entitlement. *Hughes v. Sec'y of Health & Hum. Servs.*, No. 16-930V, 2021 WL 6621169, at *3 (Fed. Cl. Spec. Mstr. Dec. 29, 2021). However, "courts have struggled with the nature and quantum of evidence necessary to establish a reasonable basis." *Wirtshafter v. Sec'y of Health & Hum. Servs.,* 155 Fed. Cl. 665, 671 (Aug. 26, 2021). "[I]t is generally accepted that 'a petitioner must furnish *some evidence* in support of the claim.'" *Id.* (quoting *Chuisano,* 116 Fed. Cl. at 288, emphasis added in *Wirtshafter*). Citing the *prima facie* elements of a successful vaccine claim described in Section 11(c)(1), the Federal Circuit recently instructed that the level of the objective evidence sufficient for a special master to find reasonable basis should be "more than a mere scintilla but less than a preponderance of proof." *Cottingham*, 971 F.3d at 1345-46.

Specifically, the Federal Circuit found that a "petition must include 'an affidavit, and supporting documentation, demonstrating that the person who suffered such injury':

(1)  received a vaccine listed on the Vaccine Injury Table;

(2)  received the vaccination in the United States, or under certain stated circumstances outside of the United States;

(3)  sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;

(4)  experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and

(5) has not previously collected an award or settlement of a civil action for damages for the same injury."

*Id.* at 1345-46.

Reasonable basis inquiries are not static — they evaluate not only what was known at the time the petition was filed, but also what is learned about the evidentiary support for the claim as the matter progresses. *Perreira*, 33 F.3d at 1377 (upholding the finding that a reasonable basis for petitioners' claims ceased to exist once they had reviewed their expert's opinion).

### a.  Parties' Arguments

Petitioner asserts that his medical history supports the injuries alleged and the vaccines connection to those injuries. He detailed the progress of the injuries following his first HPV vaccination and the worsening of his injuries following the second HPV vaccination. Mot. at 3-6.

In opposition, Respondent argues that Petitioner did not have a reasonable basis to bring the claim arguing that "[P]etitioner's claims of a vaccine injury are unsubstantiated by petitioner's medical records or any medical opinion. The petition and the allegations contained therein are based purely on petitioner's subjective beliefs." Opp. at 16. Respondent went on to question whether Petitioner suffered any vaccine injury or even received the vaccines claimed. *Id.* at 16-17. As such, Respondent concludes that Petitioner has failed to satisfy the reasonable basis standard and instead relies on a mere belief that the vaccine caused his injury. *Id.* at 18.

In the Reply, Petitioner argues that "Petitioner's medical chart supports the causal connection between vaccination and injury claimed," and that "Respondent ignores the medical records and other important evidence presented supporting the claim." Reply at 8. Furthermore, Petitioner points out that when determining the reasonable basis for a case the preponderance of evidence standards outlined in *Althen* should not be used. *Id.* at 12-13.

### b.  Existence of Reasonable Basis

#### i)  Petitioner's Relevant Medical History

*Pre-vaccination*

Before receiving the HPV vaccinations, Petitioner's medical history is significant for muscle spasms, neck and back pain, and gastro-esophageal reflux disease as detailed below. Petitioner was seen by Martha A. Meza, M.D., at Select Physical Therapy on September 7, 2017, for a year of back pain and spasms. Ex. 4 at 3. Petitioner attributed the onset of these spams to a transcutaneous electrical nerve simulation device. *Id.* at 89. The diagnosis was of unspecified pain. *Id.* at 3. On October 13, 2017, Petitioner returned to Dr. Meza with a complaint of global neck to lower back pain with bilateral glute pain and tightness. *Id.* at 77. During that visit, Petitioner noted definite improvement of his symptoms. *Id.* On February 8, 2018, Petitioner presented to a pain clinic and was seen by Lazik Der Sarkissian, M.D., for continued tightness of muscles at the back of the head and shoulder muscles with knots. *Id.* at 63. Petitioner was diagnosed with, among other things, scoliosis of thoracic spine, cervical disc degeneration, and back pain disorder. *Id.* In the plan section of that visit, the provider noted that stress and tension might have some relationship with Petitioner's clinical presentation. *Id.* Petitioner saw Dr. Meza again on October 4, 2018, for an acute upper respiratory infection of unspecified etiology. *Id.* at 13. During this visit, Petitioner was also assessed as having gastro-esophageal reflux disease without esophagitis, which had stabilized. *Id.*

On February 18, 2019, Petitioner presented to Huntington Hospital due to a worsening of his muscle spasms. *Id.* at 89. In his discharge summary, Petitioner received the diagnoses of severe systemic muscle cramping, possibly neuromyotonia, a small posterior disk protrusion of C5-C6, and a likelihood of Gilbert's syndrome. *Id.* at 90. A couple days later, Petitioner saw Dr. Meza where it was noted that Petitioner's symptoms of cramps and spasms were stable and much improved. *Id.* at 16. On March 8, 2019, Petitioner saw David A. Girard, M.D., for a neurology follow-up. Ex. 8 at 3. Dr. Girard noted that Petitioner's severe muscle cramping was of undetermined etiology. *Id.* On a return visit dated April 16, 2019, Dr. Girard stated that his clinical concern for an epileptic etiology was relatively low. *Id* at 2. Instead, he felt Petitioner's spams were most likely due to benign muscle fasciculations. *Id.*

*Post-vaccination*

According to a note from Forward Medical Group, Petitioner received his first HPV vaccine on July 3, 2019. Ex. 3 at 23. Petitioner returned to Dr. Meza's office five days later, on July 8, 2019, with a chief complaint of muscle spasms. Ex. 4 at 17. It was noted that Petitioner was hospitalized with these symptoms earlier in the year. *Id.* On July 17, 2019, Petitioner was discharged from Huntington Hospital with a diagnosis of allergic reaction and food allergies. *Id.* at 81.

On July 22, 2019, Petitioner was seen by Dr. Meza for a post urgent care follow-up. *Id.* at 18. During this visit, Petitioner reported hives and oral swelling after eating

various foods including a ham sandwich on July 12, 2019, peaches on July 17, 2019, pineapple a couple of days later and nuts. *Id.* at 18, 51. Petitioner also reported that previously he was not allergic to any food. *Id.* at 18.

On August 20, 2019, Petitioner reported to Axon Neurology for muscle spasms. *Id.* at 37. During this visit, the provider noted that, while Petitioner first noticed these spasms back in 2016, they had become more frequent. *Id.* The spasms now involved multiple muscle groups, lasting up to an hour, and happening multiple time a day. *Id.*

On August 22, 2019, Petitioner started physical therapy at Select Physical Therapy for complaints of muscle spasms and difficulty breathing. *Id.* at 55. Petitioner described these symptoms as chronic since 2016, but having increased over time. *Id.* On August 29, 2019, Petitioner visited AIRE Medical Group Inc. for food allergies. *Id.* at 49. Petitioner was prescribed an EpiPen during this visit. *Id.* at 53.

Petitioner alleged he received a second HPV vaccination on September 16, 2019. Petition ¶ 7; ex. 1 (affidavit) ¶ 6. Petitioner did not file a vaccine administration record for this second vaccination, but other medical records reference the second vaccination. The medical records from Forward indicate there was a plan for Petitioner to receive the three vaccinations in the HPV series, presumably at Forward. Ex. 3 at 23. Moreover, the records asked Petitioner whether "[he] would like to receive the final vaccine earlier than [his] upcoming March visit," possibly implying that the second vaccine had already been administered. Ex. 3 at 23. However, the Forward records do not contain a medical encounter for September 16, 2019. Rather than going to Forward, Petitioner returned to Dr. Meza' s office on September 16, 2019, but did not mention the second HPV vaccination, having been to Forward that day, or planning to go to Forward later. Ex. 4 at 20. The VAERS report, dated November 3, 2020, only references the July 3, 2019 HPV vaccination and does not mention a September 16, 2019 HPV vaccination. Ex. 10. At a January 31, 2020, appointment with Dr. Sage, Petitioner correlated his symptoms "start[ing] after 2nd HPV vaccine." Ex. 12 at 7.

At the September 16, 2019, appointment with Dr. Meza, Petitioner's chief complaint was anxiety. Ex. 4 at 20. Petitioner reported he attributed his increased anxiety to having muscle spasms with an unclear etiology. *Id.* Petitioner also stated that it had become increasingly difficult to perform his work duties. *Id.* A letter from Toshiaki Udo, Ph.D., on September 23, 2019, was written to support Petitioner's application for short-term disability benefits. *Id.* at 138. In the letter, Dr. Udo opines that Petitioner's "panic attacks" and fear of driving or going outside, all due to his muscle spasms, were serious enough to warrant some time away from work. *Id.*

To determine the cause of his spams, Petitioner had several tests performed between the end of September 2019 and the middle of December 2019, including an MRI of his brain and spine and an EMG nerve conduction study of his left lower and upper extremities. Ex. 4 at 29, 31; ex. 13 at 4. However, these tests did not provide any definitive answers. *Id.* On December 13, 2019, Petitioner again visited Dr. Meza's office due to his continued painful muscle spasms. Ex. 4 at 21. Petitioner informed Dr. Meza that he had been unable to return to work due to his symptoms and that he had become very anxious about driving and sitting in meetings due to his painful spams. *Id.* That same day, Petitioner also had an appointment with Axon Neurology where it was noted Petitioner's spasms were occurring daily, involved major muscle groups, lasted about half an hour, and could happen multiple times a day. *Id.* at 41.

On January 31, 2020, Petitioner went to Blue Oak Clinic for an initial acupuncture visit for his chronic muscle spasms. Ex. 12 at 7. During this visit, it was noted that Petitioner correlated his symptoms to his second HPV vaccine. *Id.* It was also noted that after the shot, Petitioner developed severe nut, pineapple, and peach allergies. *Id.*

Petitioner had another appointment at Blue Oak Clinic on March 18, 2020. *Id.* at 15. It was noted during this visit that his muscle spasms were less frequent which Petitioner attributed to myofascial release and Eye Movement Desensitization and Reprocessing therapy. *Id.*

Petitioner was seen at VQ Vision for treatment of a visual condition that contributed to difficulty with near tasks and generalized anxiety. Ex. 11 at 82. It was recommended that Petitioner undergo four additional sessions of optometric phototherapy. *Id.*

On July 6, 2020, Petitioner returned to Blue Oak Clinic for a consult about his muscle spasms and allergies. Ex. 12 at 17. It was noted that Petitioner had been doing myofascial release for three weeks and that he rarely has muscle spasms. *Id.* Petitioner's generic EpiPen had also been recalled and it was noted that he still suffers a sore throat with certain foods. *Id.*

On November 5, 2020, Petitioner had an appointment with Dr. Tanya Polec at VQ Vision where one of the complaints Petitioner had due to his receipt of the HPV vaccine was trouble focusing his eyes. Ex. 11 at 71. On November 12, 2020, Petitioner returned to Blue Oak Clinic for a consult about anaphylaxis which he linked to the HPV vaccine he received in July 2019, as his first allergic reaction was 9 days after the vaccine. Ex. 12 at 19.

### ii) Petitioner's Medical History Satisfies Reasonable Basis

Respondent argues that Petitioner has failed to provide enough objective evidence to meet the elements emphasized in *Cottingham*. Opp. at 15. In particular, Petitioner has failed to establish a causal connection between any of his alleged injuries and the vaccine. *Id.* at 16-18. Respondent claims that each of Petitioner's alleged injuries either existed before his purported vaccinations or were never formally diagnosed by a medical professional. *Id.* at 16.

While the medical records are sparse in certain areas, Petitioner has provided enough evidence to satisfy reasonable basis. At a minimum, the records provide objective evidence that might suggest some relationship between his allergic reaction and his vaccination. "Medical records can support causation even where the records provide only circumstantial evidence of causation." *Harding v. Sec'y of Health & Hum. Servs.*, 146 Fed. Cl. 381, 403 (Dec. 9, 2019). After his first HPV vaccination on July 3, 2019, Petitioner's medical records provide a timeline in the following days for his first allergic reaction to food. Ex. 4 at 51. This timeline of symptoms is confirmed by Petitioner's discharge from Huntington hospital with a diagnosis of food allergies on July 17, 2019, 14 days after his first HPV vaccine. *Id.* at 81.

Respondent claims that Petitioner suffered from food allergies prior to receiving the alleged vaccinations. Opp. at 16 (citing ex. 3 at 3; ex. 15 at 9). However, a review of the Forward records (ex. 3 at 3) show that the listing of "nuts" under the allergies section is not specifically tied to the January 2019 appointment as alleged by Respondent. Rather, the Forward records are not clearly delineated into appointments and the records appear to only have one allergies section that summarizes all allergies recorded at Forward, including treatment that extended into 2020. Thus, the nuts allergy could have been recorded at Forward in 2020, long after the HPV vaccinations. Additionally, Respondent's other citation about food allergies, exhibit 15 at 9, is an office visit at AIRE Medical Group Inc., dated September 27, 2019, months after Petitioner's first HPV vaccine. During this visit, Petitioner was assessed to have a presumptive food allergy and was prescribed an EpiPen. Considering these medical records, along with Petitioner's affidavit, it appears that Petitioner's food allergies first occurred after receipt of the first HPV vaccine on July 3, 2019.

Moreover, the fact that some of Petitioner's other symptoms (e.g., muscle spasms, anxiety, and chest pain) occurred at some level before his alleged vaccinations does not mean that Petitioner's claim has no reasonable basis. Opp. at 17. Although pre-existing symptoms could demonstrate that it is unlikely that the HPV vaccinations caused these injuries in the first instance, there is still the possibility that the HPV vaccinations significantly aggravation these pre-existing injuries. A record from Axon Neurology dated

August 20, 2019, notes that Petitioner had muscle spasms since 2016, but also notes that the spasms post-vaccination became more frequent, could last half an hour or so, and happened multiple times a day. Ex. 4 at 37. After the HPV vaccinations, the medical records also indicate that Petitioner requested to be put on short-term disability in September 2019, that he had not returned to work by December 13, 2019, and that the anxiety from his muscle spasms made him anxious about driving and sitting for long meetings. Ex. 4 at 40, 138. All of these changes in Petitioner's symptoms allows for a possible connection between Petitioner's vaccinations and the aggravation of some of Petitioner's pre-existing symptoms.

Petitioner also submitted the HPV product monograph and a VAERS report completed by Dr. Anna Blessing from Forward Healthcare Services linking the HPV vaccine to Petitioner's symptoms. Ex. 10; ex. 2. These two documents, taken together with the records filed and Petitioner's own affidavit, provide more than a "mere scintilla" of evidence for a determination of reasonable basis.

Respondent further maintains that Petitioner has failed to provide evidence that he even received the vaccines claimed to have caused his alleged injuries. But Petitioner has provided enough evidence of vaccination for the purposes of determining reasonable basis. While Petitioner has not provided all the vaccine administration records, he has provided a signed affidavit stating when he received the vaccinations along with several medical records indicating that he received the vaccines in question. Ex. 1 at 1; ex. 3 at 23; ex. 12 at 19. Thus, this matter is also sufficiently substantiated with a mix of objective proof sufficient for a favorable reasonable basis determination.

I do make one final proviso, consistent with my discretion to deny or reduce fees *even* when good faith and reasonable basis have been adequately established. Based on my experience repeatedly deciding HPV vaccine-based claims, I have become extremely skeptical of assertions that this particular vaccine can cause longer-term non-specific symptoms, or otherwise interfere with the autonomic nervous system. *See,* e.g., *Hughes v. Sec'y of Health & Hum. Servs.*, No. 16-930V, 2021 WL 839092, at *31 (Fed. Cl. Spec. Mstr. Jan. 4, 2021), *mot. for review denied*, 154 Fed. Cl. 640 (2021); *E.S. v. Sec'y of Health & Hum. Servs.*, No. 17-480V, 2020 WL 9076620, at *40, 43 (Fed. Cl. Spec. Mstr. Nov. 13, 2020), *mot. for review denied*, 154 Fed. Cl. 149 (2021); *McKown v. Sec'y of Health & Hum. Servs.*, No. 15-1451V, 2019 WL 4072113, at *44–45 (Fed. Cl. Spec. Mstr. July 15, 2019). It is likely in the future that I will warn petitioners filing such claims that they simply lack scientific support – and therefore efforts to assert them invites a finding that they had no reasonable basis *from their outset*. As a result, if present counsel continues to pass through the Program in present fashion in order to reach his favored forum, he runs the strong risk that I will find *no* fees are warranted – 240-day

withdrawal or not. But I will only invoke this admonition in cases *not yet filed*, and thus intend to pay fees in the presently pending matters.

### IV.   Fees and Costs Calculation

#### A.   Legal Standard

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include hours in their fee requests that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id.* at 1522. Furthermore, the special master may reduce a fee request *sua sponte*, apart from objections raised by respondent and without providing a petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 209 (2009). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (2011). Rather, when assessing attorney's fees and costs, the goal is to achieve a "rough justice." *Fox v. Vice*, 563 U.S. 826, 838 (2011),

#### B.   Attorney's fees

##### 1.   Hourly Rates

Petitioner requests compensation for attorney Andrew D. Downing based on the following rates: $385 per hour for time billed in 2020-21 and $415 for time billed in 2022. Mot., ex. A at 16. For attorney Courtney Van Cott, Petitioner seeks $275 per hour, and for paralegals Robert W. Cain and Danielle P. Avery, Petitioner seeks a rate of $135 per hour. *Id.* The requested rates for time billed in 2020-2022 are reasonable and are consistent with what has previously been awarded for work these individuals have performed in other cases.[8] *Roach v. Sec'y of Health & Hum. Servs.*, No. 20-789V, 2022 WL 1008288, at *4 (Fed. Cl. Spec. Mstr. Mar. 10, 2022).

---

[8] The Attorney's Fee Schedules for 2020-22 are available at http://www.uscfc.uscourts.gov/node/2914.

2.    Hours Billed

In total, Petitioner requests compensation for 59.70 hours of work performed by his attorneys and paralegals Mot., ex. A; Supp. Mot., ex. A. Specifically, attorney Andrew D. Downing billed 21.50 hours, attorney Courtney Van Cott billed 6.60 hours, paralegal Danielle P. Avery billed 28.40 hours, and paralegal Robert W. Cain billed 3.20 hours. *Id.* Much of the time billed was reasonable (albeit for a case in which most of the work performed was directed toward records gathering), but the following time entry issues will be discussed: (1) inappropriate billing for clerical tasks; (2) inappropriate billing for duplicative work; (3) one-time billing for legal issues related to this and similar attorney's fees and costs motions; and (4) excessive billing for preparation of the attorney's fees and costs motion.

First, the billing records reveal several instances in which work was performed for tasks considered clerical (also referred to as administrative or secretarial tasks). In the Vaccine Program, this type of work "should be considered as normal overhead office costs included within the attorney's fee rates." *Rochester v. U.S.*, 18 Cl. Ct. 379, 387 (1989); *Dingle v. Sec'y of Health & Hum. Servs.*, No. 08-579V, 2014 WL 630473, at *4 (Fed. Cl. Spec. Mstr. Jan. 24, 2014). "[B]illing for clerical and other secretarial work is not permitted in the Vaccine Program." *Mostovoy v. Sec'y of Health & Hum. Servs.*, No. 02-10V, 2016 WL 720969, at *5 (Fed. Cl. Spec. Mstr. Feb. 4, 2016) (citing *Rochester*, 18 Cl. Ct. at 387).

The primary paralegal on this case, Danielle P. Avery, billed time for various clerical tasks, including electronically filing documents via CM/ECF, reviewing the automatically generated emails for those CM/ECF filings, preparing invoices, and correspondence regarding invoices. Mot., ex. A at 4-13. Billing for such clerical work is not permitted in the Vaccine Program, and Mr. Downing has been repeatedly admonished for having his paralegals bill time for clerical tasks. *Finefrock v. Sec'y of Health & Hum. Servs.*, No. 20-42V, 2022 WL 3153258, at *2 (Fed. Cl. Spec. Mstr. July 20, 2022); *Sheridan v. Sec'y of Health & Hum. Servs.*, No. 17-669V, 2019 WL 948371, at *2-3 (Fed. Cl. Spec. Mstr. Jan. 31, 2019); *Moran v. Sec'y of Health & Hum. Servs.*, No. 16-538V, 2019 WL 1556701, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019). Thus, I will reduce paralegal Avery's time by 6.5 hours for repeatedly billing for clerical tasks that are not covered by the Vaccine Act, a deduction of $877.50 (6.5 hours x $135 hourly rate).

Second, all the attorneys and paralegals billed duplicative time for reviewing medical records. *See* Mot., ex. A at 1-15. For almost every set of medical records, paralegal Avery would initially conduct "analysis" on the medical records, followed by paralegal Cain's efforts to "identify potential critical items," and cumulating in attorney Downing's "analysis" of the same records. *Id.* Rather than identify individual medical

records, attorney Van Cott block-billed for "substantive analysis" of the medical records and the overall case. *Id.* at 3. These duplicate charges from four legal professionals repeated for even minimal sets of medical records, including the records from Dr. Girard (3 pages – exhibit 8), Select Physical Therapy (5 pages – exhibit 7), Catz Physical Therapy (15 pages – exhibit 5), Axon Neurology (15 pages – exhibit 6), and Aire Medical Group (16 pages – exhibit 15). *Id.* Similar to the issue of billing for clerical tasks addressed above, Mr. Downing has been frequently warned, and has had significant fees reductions for duplicative billing. *Finefrock*, 2022 WL 3153258, at *2; *Dreyer v. Sec'y of Health & Hum. Servs.*, No. 18-764V, 2019 WL 6138132, at *3 (Fed. Cl. Spec. Mstr. Oct. 29, 2019). Thus, I will reduce attorney Van Cott's hours by 2 for a reduction of $550 (2 hours x $275 hourly rate), reduce paralegal Cain's hours by 3 for a reduction of $405 (3 hours x $135 hourly rate), and reduce paralegal Avery's hours by 3 for a reduction of $405 (3 hours x $135 hourly rate). The total deduction for the duplicative time for reviewing the same medical records is $1,360.00 ($550+$405+$405).

Third, counsel in this case devoted time to its prosecution that should not again be billed to comparable claims in the future. As mentioned above, there are currently multiple cases before me, all handled by Mr. Downing, in which petitioners alleging injuries due to the HPV vaccine have also exited the Vaccine Program via the 240-day withdrawal procedure. Early in these series of similarly situated cases, Respondent standardized his responses to Mr. Downing's fee motions and, subsequently, Mr. Downing standardized his replies to Respondent, essentially creating and using template filings.

Mr. Downing will only be credited once, in this case, for the time required to develop the standardized legal arguments in his numerous fees motions and replies.[9] Thus, aside from minimal attorney time for a final review of the fees motions and replies,[10] any other attorney time billed for drafting fees motions and replies should not be paid in *subsequent* cases. Preparing fees motions and replies with the established templates in subsequent cases should only be billed as paralegal time.

Lastly, Mr. Downing devoted a somewhat large block of time (3.1 hours) to preparing the pending motion for attorney's fees and costs. Mot., ex. A at 3. While, as noted above, Mr. Downing is being credited once with the development of the fees motion template for this type of 240-day withdrawal case, Mr. Downing admits that this motion is a "short form" motion with only boilerplate legal arguments and would need to be

---

[9] The 5.8 hours Mr. Downing billed to draft the legal arguments in the reply will only be awarded this once. Supp Mot., ex. A at 1. The arguments advanced herein were novel, justifying more work than usual – but time for the same arguments will not be awarded in the other pending fee cases involving withdrawn HPV vaccine cases.

[10] Mr. Downing typically bills 0.1 hours to review draft filings in a "supervisory capacity and finalize." *See* e.g., Mot., ex. A at 1-3.

supplemented only if Respondent objected to the attorney's fees and costs sought. Mot. at 6-7. The only portion of the motion that is unique to this case and might merit some time and attention by Mr. Downing – Petitioner's medical history and the reasonable basis argument – is identical to the medical history in the original petition. *Compare* Mot. at 3-5 *with* ECF No. 1 at 2-4. Mr. Downing appears to have only added one paragraph to the reasonable basis argument beyond the medical history taken from the petition. Mot. at 6. Thus, I find the amount of time Mr. Downing charged to prepare this motion to be excessive and reduce his time to 1.0 hour, a reduction of <u>$871.50 (2.1 hours x $415 hourly rate)</u>.

### 3.   General Fees Reduction Appropriate

As mentioned previously, this case departed the Program while in its procedural infancy. As a practical matter, all that has been accomplished in this case is Petitioner obtaining and filing what he believes to be the minimum evidence required to move this case out of the PAR review. In fact, outside of the initial petition, the only substantive filings from either party are related to the attorney's fees and cost issue currently before me. Nothing of substance was accomplished in this case, beyond meeting the Act's basic requirements for moving the claim to the point to which it could be legitimately removed.

Although I have found that a fees award is appropriate herein, I also find, in the reasonable exercise of my discretion under the circumstances, that the overall *magnitude* of the award should be more modest than what has been requested. For even if petitioners may legitimately pass through the Program en route to the "promised land" of another forum in which they hope to receive a favorable determination, I am not compelled by the Act to turn a blind eye to this stratagem – especially since it is highly likely (if not a certainty) that this claim, as well as the other comparable claims being dismissed, would have resulted in an unfavorable determination *had it been litigated fully in the Vaccine Program.* Claims alleging injuries of this nature after receipt of the HPV vaccine have not resulted in damages awards.

Because of the above, a request for more than $15,000.00 for attorney's fees and costs is excessive in the context of a case that lasted less than nine months and was never intended to be litigated herein. As a result, I will rely on my authority to make reasonable percentage reductions in fees in appropriate cases. *Abbott v. Sec'y of Health & Hum. Servs.*, No. 10-485V, 2017 WL 2226614, at *7-8 (Fed. Cl. Spec. Mstr. Apr. 26, 2017) mot. for rev. denied, 135 Fed. Cl. 107, 111-12 (2017). After reducing the total amount of fees requested by the specific deductions noted above, I also impose a twenty-five (25) percent reduction in the sum to be awarded, resulting in a total fees award of

$8,662.13.[11] I will employ this same reduction to all comparable claims, unless the total fees requested do not exceed $5,000.00.

### C.    Attorney's Costs

Petitioner requests $455.74 in overall costs. Mot. at 6; Mot., ex. A at 16. This amount is comprised of obtaining medical records, shipping fees, and the Court's filing fee. Mot., ex. A at 15-16. In his Motion, pursuant to General Order #9, counsel indicates that Petitioner incurred no out-of-pocket litigation costs. Mot. at 8. I have reviewed all the requested costs and find them to be reasonable, and award them in full.

### CONCLUSION

The Vaccine Act permits an award of reasonable attorney's fees and costs. Section 15(e). Accordingly, I hereby **GRANT IN PART** Petitioner's Motion and Supplemental Motion, and award a total of $9,117.87 (consisting of $8,662.13 in fees and $455.74 in costs) as a lump sum in the form of a check jointly payable to Petitioner and Petitioner's counsel. In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] **Calculation of fees reductions:**

| Initial & supplemental fees requested | $14,658.50 |
|---|---|
| Reduction for clerical tasks | -$877.50 |
| Reduction for duplicate billing | -$1,360.00 |
| Reduced hours for drafting fees motion | -$871.50 |
| 25% reduction | -$2,887.38 |
| **Total fees award** | **$8,662.13** |

[12] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.